# IN THE SUPREME COURT OF IOWA

No. 19–1919

Submitted September 15, 2022—Filed December 2, 2022

**STATE OF IOWA,**

Appellee,

vs.

**TYJAUN LEVELL TUCKER,**

Appellant.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.

A defendant appeals a criminal conviction, claiming the district court wrongfully excluded evidence under Iowa Rule of Evidence 5.106 (rule of completeness) and Iowa Rule of Criminal Procedure 2.14(6)(*c*) (discovery sanction). **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, and McDonald, JJ., joined. McDermott, J., filed a dissenting opinion, in which Oxley, J., joined. May, J., took no part in the consideration or decision of the case.

Jessica Donels (argued) and Andrew Dunn of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

In this case, the defendant appeals his conviction for possession of a controlled substance with intent to deliver in violation of Iowa Code section 124.401(1)(*d*) (2018). The defendant states five alternative grounds for his appeal. He claims violations of his state constitutional right to a jury drawn from a fair cross section of the community and his right to effective assistance of counsel. He also claims the district court wrongfully excluded exculpatory evidence in two separate instances. Finally, he claims the jury convicted him based on insufficient evidence.

The court of appeals affirmed the conviction in all respects. On further review, we also affirm the conviction and conclude that Iowa Rule of Evidence 5.106 and the common law doctrine of completeness cannot trump Iowa Rule of Evidence 5.402, which states irrelevant evidence is not admissible.

## I. Background Facts and Proceedings.

Two Des Moines police officers pulled over Tyjaun Tucker on July 28, 2018, at about 10:42 p.m. Before the stop, the officers drove past Tucker, seated in his stationary car, exchanging something with a woman standing at his open car window. When Tucker noticed the police, he immediately drove out of the parking lot, pulling in front of oncoming traffic and nearly causing an accident. The officers then followed and stopped Tucker's car. Officer Garrett, one of the two officers, wore a bodycam that recorded the stop.

During the stop, the officers smelled marijuana. Tucker had no driver's license and claimed he had lost it earlier that day. The officers detained Tucker,

restrained his hands, and searched his car. They discovered $650, mostly denominated in $100 bills, in the car's center console. The officers also searched Tucker's person. When they noticed something hidden in his pants, he launched into an obscenity-laced outburst. He started to run away, scream for help, shout at the officers to get off of him, and accuse them of both fighting him for no reason and setting him up. Tucker also repeatedly asked why the officers were "grabbing" him. The object in Tucker's pants turned out to be one ounce of marijuana hidden in his underwear.

The State later charged Tucker by trial information for possession of a controlled substance with intent to deliver. Iowa Code § 124.401(1)(*d*). The State formally requested reciprocal discovery no less than three times between October 17, 2018, and December 28, 2018. Upon the State's motion, on January 3, 2019, the district court ordered Tucker to exchange reciprocal discovery within fourteen days. A trial was set for June 3.

On that day, the parties appeared before the district court to discuss pretrial matters. After unsuccessful plea negotiations, jury selection began. Tucker challenged the jury pool's composition on the grounds that it did not represent a fair cross section of the community, leading the trial court to analyze the jury pool's racial composition under the three-pronged test outlined in *State v. Lilly*, 930 N.W.2d 293, 298–308 (Iowa 2019).

The parties disagreed about the third prong, whether the county's jury selection processes systematically excluded African-Americans from the jury pool. They agreed that Tucker, who is African-American, is a member of a

distinctive group in the community. They also agreed the number of African-Americans in the jury pool fell short of the community's population of jury-eligible African-Americans by more than one standard deviation. With resistance from the State, the district court continued the trial so Tucker could obtain expert testimony or other evidence for the third prong. *See id.* at 299 (citing *State v. Plain*, 898 N.W.2d 801, 821 (Iowa 2017)) (setting out the three prongs as originally outlined by the United States Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Discussion was also held on the record with Tucker's lawyer about the names of two local fair-cross-section experts who might be called as expert witnesses for the third prong.

The rescheduled trial commenced on August 19, with a new jury pool. Tucker again made a fair-cross-section challenge under *Lilly*. As before, the parties agreed the first prong of *Lilly* was satisfied, so the district court proceeded to the second prong, calculating the standard deviation of the number of African-Americans in the jury pool relative to the proportion of African-Americans in Polk County. Of the 245 jurors in the jury pool, 9 were African-American. Given that 5.4% of the Polk County population were jury-eligible African-Americans, the court determined the jury pool underrepresented African-Americans by a standard deviation factor of 1.19, which satisfied the second prong.

The district court then considered the third *Lilly* prong. Tucker argued the jury selection process caused systematic underrepresentation of African-Americans because the county relied on voter registration and driver's license records. Statistically speaking, Tucker claimed that "minorities sign up for

licenses at a lower rate and also register to vote at a lower rate." To support this argument, he cited one law review article, Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 Drake L. Rev. 761 (2011). He did not put on expert testimony due to "practical problems." He explained he could not hire a court-appointed expert until he had a basis to do so, and he could not know if he had a basis to hire an expert until the jury pool appeared in the courthouse.

The district court ultimately determined Tucker failed to satisfy the third *Lilly* prong. It reasoned Tucker did not explain how using information from sources other than voter identification and driver's license records would increase minority jury representation. It also reasoned Tucker did not prove the jury selection processes systematically excluded racial minorities. The parties then proceeded to jury selection and empaneled a jury. The court ordered Tucker multiple times to stand when the jury first entered the courtroom, but Tucker refused. He told the court he was hurt and could not stand, despite the fact he had stood moments earlier without any difficulty.

During trial, Tucker lodged various objections to the district court's evidentiary rulings. Two of these objections are relevant in this appeal. First, on the afternoon of the second day of trial, which ended up being the final day of the State's case, Tucker sought to introduce documentary evidence of a settlement payout he received from the QuikTrip Corporation. The documentary

evidence included a settlement statement from a law firm,[1] a contract releasing Tucker's claims against QuikTrip, various professional invoices, and other documents. Tucker intended to use these documents to demonstrate the $650 cash found in his car did not come from drug sales. However, Tucker had not shared any of these settlement documents with the State during reciprocal discovery. For that reason, the district court prohibited Tucker from introducing them under Iowa Rule of Criminal Procedure 2.14(3). The court, however, did allow Tucker to testify about the settlement but, upon a motion in limine from the State, ordered him not to mention the settlement documents. In return, the State agreed not to call attention to the fact Tucker introduced no documents proving the settlement.

Second, pursuant to Iowa Rule of Evidence 5.106, Tucker sought to play for the jury an unedited version of Officer Garrett's bodycam video during his case-in-chief. The State had previously shown the edited version during its examination of Officer Garrett. The unedited footage showed one officer telling a second officer that a third officer, who was not present, had once shot Tucker. In contrast, both the edited and unedited footage showed Tucker telling officers, "I'm the one Scarlet shot right here down here on M.L.K." Tucker specifically wanted the jury to know he had been shot by a police officer, claiming that fact was relevant to the reason the police stopped him and the reason he has problems with law enforcement.

---

[1]The law firm of Tucker Law Office represented Tucker in his case against QuikTrip. Tucker and his attorneys at Tucker Law Office happen to share the same last name. They are not related.

The district court did not allow Tucker to play the unedited footage. As a general matter, the district court supported "the idea that the jury should be able to see everything and anything that happened" during the traffic stop. Nevertheless, the court determined the fact a police officer once shot Tucker was not relevant to the charge of possession with intent to deliver. The court also thought the officer's statements posed hearsay, character evidence, and rule 5.403 problems. While the court would not permit Tucker to show the unedited footage during his case-in-chief, the court did say it would have required the State to show the unedited footage during the State's case-in-chief when Officer Garrett testified, if asked to do so under the completeness doctrine. The court then ordered Tucker not to mention either being shot by a police officer or the existence of unedited bodycam video.

Tucker took the witness stand during the trial. He testified he was in a fast-food parking lot on the night of July 28, 2018, and the police followed him when he drove away. He said the police had no reason to initiate a traffic stop and accused the police of withholding video evidence that would prove him right. He repeatedly testified the State had unedited bodycam video that it was not presenting. Tucker agreed the officers claimed to smell marijuana, but he denied having any when asked. He said there was video of officers putting marijuana in his car. When his lawyer asked why he believed the police planted marijuana in his car, Tucker responded, "I was shot by the police[,] . . . a detective here in Des Moines." The State objected to Tucker's multiple references to unedited bodycam video and the testimony that a detective shot him. The district court

granted motions to strike this testimony pursuant to its ruling on the State's motion in limine.

Tucker's lawyer then asked to discuss legal matters with the court, outside the jury's presence. The court excused the jury and spoke with Tucker and his lawyer. It cautioned Tucker not to violate the motion in limine rulings again. Tucker defended his actions by stating he was keeping his oath to give the whole truth. The court then repeated its instruction to respect the motions in limine. The jury returned to the courtroom, and Tucker's attorney began to ask questions about the QuikTrip settlement. When asked about the amount of the settlement, Tucker said he had submitted paperwork proving the settlement but the court would not show it to the jury. The court sustained objections from the State and admonished the jury to disregard. Tucker concluded his direct examination by saying he used the settlement to buy a car the day the police stopped him and the $650 that the police found was the remainder.

On cross-examination, Tucker again declared the marijuana was not his and he had no idea where it came from. He maintained the unedited video would show how the marijuana "mysteriously" came to be found on him. The State asked whether he had meant to imply police planted the marijuana on him. Tucker responded "planted" might be the wrong word, but he was not sure what word to use because "people don't want to hear that police do those types of things."

On August 21, the jury convicted Tucker as charged, and he timely appealed. We transferred his case to the court of appeals, which affirmed the conviction. Tucker applied for further review, which we granted.

**II. Standard of Review.**

Our standard of review for constitutional claims is de novo. *State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019) (citing *Plain*, 898 N.W.2d at 810). "Evidentiary rulings are generally reviewed for abuse of discretion." *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017) (citing *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003); *State v. Spargo*, 364 N.W.2d 203, 209 (Iowa 1985)). We review insufficient evidence claims for errors at law. *State v. Dalton*, 674 N.W.2d 111, 116 (Iowa 2004) (citing *State v. Spies*, 672 N.W.2d 792, 796 (Iowa 2003)). We do not review claims of ineffective assistance of counsel on direct appeal. Iowa Code § 814.7 (2022); *State v. Tucker*, 959 N.W.2d 140, 152–53 (Iowa 2021).

**III. Analysis.**

Tucker presents two constitutional arguments and three evidentiary grounds for his appeal. On the constitutional front, he initially claims a violation of his right under the Iowa Constitution to have his jury drawn from a fair cross section of Polk County. He also claims ineffective assistance of trial counsel. Tucker then makes three evidentiary arguments. First, Tucker argues the district court abused its discretion under Iowa Rule of Criminal Procedure 2.14(6)(*c*) by excluding the QuikTrip settlement documents as a discovery sanction. Second, Tucker argues the district court abused its discretion under the rule of

completeness and Iowa Rule of Evidence 5.106 by denying his request to show the jury an unedited version of Officer Garrett's bodycam video. Finally, Tucker disputes the sufficiency of the evidence against him.

**A. The Right to a Jury Drawn from a Fair Cross Section of the Community.** Tucker first claims a violation of his right to a jury drawn from a fair cross section of the community under article I, section 10 of the Iowa Constitution. *See Lilly*, 930 N.W.2d at 300–01. As in the court of appeals and the district court below, Tucker's claim turns on the third *Lilly* prong—causation. *See State v. Veal*, 930 N.W.2d 319, 328 (Iowa 2019) ("[T]he defendant must prove 'causation,' that is, that the underrepresentation actually resulted from a particular feature or features of the jury selection system." (quoting *Lilly*, 930 N.W.2d at 306)).

We agree with the court of appeals and district court. Tucker failed to causally connect any systematic underrepresentation of African-Americans in his jury pool to any of Polk County's jury selection processes. This failure occurred even though the district court continued the trial so Tucker could obtain evidence of systematic exclusion. After almost three months, Tucker returned for trial with a single law review article that concluded racial minorities register to vote and obtain driver's licenses at disproportionately low rates. That correlation by itself, cited from a decade-old law review article, fails to prove Polk County's jury selection processes caused systematic exclusion.

**B. Ineffective-Assistance-of-Counsel Claims on Direct Appeal.** Tucker argues his trial counsel was ineffective for failing to secure testimony from a fair-

cross-section expert. This claim is not properly before us, as the court of appeals recognized. Claims of ineffective assistance of counsel must now be raised in the first instance on postconviction review. Iowa Code § 814.7; *see also, e.g., State v. Treptow*, 960 N.W.2d 98, 103–08 (Iowa 2021) (upholding section 814.7 against separation of powers, due process, and equal protection challenges). Accordingly, we do not consider Tucker's ineffective-assistance claim at this time. He must wait to bring any claims of ineffective assistance in an application for postconviction relief. *See* Iowa Code § 814.7.

**C. Iowa Rule of Criminal Procedure 2.14 and the Settlement Documents.** Tucker next argues that, as a discovery sanction, the district court wrongfully excluded documents evidencing his settlement payout from QuikTrip. Tucker's brief frames the settlement documents' exclusion as both a violation of his state and federal constitutional rights and an abuse of district court discretion. We begin by considering whether Tucker preserved error on the constitutional aspects of this claim.

Litigants may not raise issues—including constitutional issues—for the first time in an appeal. *State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008) (citing *State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997)). We follow this familiar and fundamental rule for many reasons. For one thing, the rule helps "ensure that the opposing party and the district court are alerted to an issue at a time when corrective action can be taken or another alternative pursued." *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) (en banc). In addition, well-reasoned appellate decisions depend on "the benefit of developed arguments

on both sides and lower court opinions squarely addressing the question." *Yee v. City of Escondido*, 503 U.S. 519, 538 (1992) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 552 n.3 (1990)); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (citing *Yee*, 503 U.S. at 538).

Here, we agree with the court of appeals that Tucker did not preserve error on the constitutional dimension of this claim. Tucker failed to lodge any constitutional objections. Once the State motioned to exclude the settlement documents, Tucker's attorney sought to excuse the late disclosure and concluded by saying, "I don't think it would be appropriate to exclude these documents. Mr. Tucker has a right to put a defense on, and we would ask you to overrule the state's motion." This statement does not adequately preserve error for constitutional claims, just as a claim that a statute is unconstitutional is not specific enough to preserve error. *See State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002) ("[A] party challenging the constitutionality of a statute must alert the court to what specific constitutional provisions are allegedly compromised by the statute."). Neither Tucker nor his lawyer specified which constitutional rights were purportedly violated; they did not mention the State or Federal Constitutions either. Tucker's vague reference to the right to put on a defense is insufficiently specific to preserve error on a claim under the Fifth Amendment to the United States Constitution or article I, section 10 of the Iowa Constitution.

At the same time, there are simply no rulings by the district court on any constitutional issues that might inhere in its discovery sanctions. *See Meier*, 641

N.W.2d at 537. Neither did it consider constitutional concerns in its ultimate reasoning about the settlement documents: only the rules of evidence and criminal procedure were referred to in the court's ruling. The trial was the right time to raise any constitutional issue because the district court could have taken corrective action. Tucker's failure to raise a constitutional objection during the trial, which prevented the district court from taking corrective action, belies the existence of a constitutional violation. As a result, Tucker did not adequately preserve error, so we decline to consider whether the discovery sanctions violated his rights under the Fifth Amendment or article I, section 10. *See Mitchell*, 757 N.W.2d at 435 (refusing to consider a due process claim that the district court never decided).

We therefore evaluate this claim as a challenge to the district court's evidentiary rulings. Tucker believes the district court improperly excluded documentary evidence that he received a cash settlement from a lawsuit against QuikTrip. He acknowledges he failed to provide the State with copies of the documents in violation of the reciprocal discovery order and only presented the evidence on the State's final day of its case-in-chief. However, he insists the district court abused its discretion by choosing to exclude the evidence instead of admitting the evidence or granting a continuance. He argues the settlement documents should have been admitted because they were relevant, reliable, and only slightly prejudicial to the State.

Discovery rules and procedures for criminal cases are set out in the Iowa Rules of Criminal Procedure. *See generally* Iowa R. Crim. P. 2.14 (outlining rules

for depositions, reciprocal discovery, continuing duties to disclose, and regulating discovery). Importantly, the rules of criminal procedure are not suggestions. Just as the rules of civil procedure "have the force and effect of statute," *Van Gundy v. Van Gundy*, 56 N.W.2d 43, 46 (Iowa 1952) (citing *Hubbard v. Marsh*, 32 N.W.2d 67, 68 (Iowa 1948)), so do the rules of criminal procedure. *See* Iowa Code chapter 813 (incorporating the rules of criminal procedure directly into the Iowa Code). If a party violates a discovery rule or order, the court enjoys the discretion to allow discovery, continue the proceedings, bar undisclosed evidence, or fashion "such other order as it deems just under the circumstances." Iowa R. Crim. P. 2.14(6)(*c*).

Four considerations may guide district courts in exercising this discretion: (1) the reason for the violation, (2) any prejudice that results from the violation, (3) the feasibility of potential discovery sanctions, and (4) other pertinent facts and circumstances. *State v. Veal*, 564 N.W.2d 797, 810–11 (Iowa 1997), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998), *vacated by Hallum v. Iowa*, 527 U.S. 1001 (1999); *see also State v. Brown*, 397 N.W.2d 689, 698 (Iowa 1986) (en banc) (using the four considerations to affirm a district court's decision not to exclude witness testimony after a discovery violation); *State v. Thompkins*, 318 N.W.2d 194, 197–98 (Iowa 1982) (setting out the four considerations later used in *State v. Brown* and *State v. Veal*); *cf. State v. Babers*, 514 N.W.2d 79, 82 (Iowa 1994) (affirming a district court ruling that considered merely a discovery violation's circumstances and resulting prejudice); *State v. Froning*, 328 N.W.2d 333, 337–38 (Iowa 1982)

(explaining district courts may consider the reasons for the violation and the extent of the prejudice).

In this case, our analysis of the four considerations leads us to conclude the district court did not abuse its discretion. Applying the *Veal* considerations, we determine none weigh in Tucker's favor.

On the first consideration, we conclude Tucker has not adequately justified his failure to disclose the settlement documents. Throughout the pretrial proceedings, Tucker violated both his initial and continuing reciprocal discovery obligations to the State. *See* Iowa R. Crim. P. 2.14(2)–(3), (5).

In the year leading up to the trial, the State requested reciprocal discovery multiple times. Tucker did not reciprocate with the settlement documents on any of those occasions. When the court ordered reciprocal discovery in January 2019, Tucker failed to comply. Had Tucker been in jail, perhaps that failure would be more understandable. But he was not. The record shows Tucker was not in custody between September 12, 2018, and August 21, 2019. On the morning of the original trial date, the parties made an extensive record about Tucker's decision to decline a plea agreement because he believed the State could not prove he had intent to distribute. Even though the trial was scheduled to start that day and the issue of intent loomed large, Tucker still did not disclose the settlement documents. After the continuance for the fair-cross-section question, Tucker continued to keep the documents close to his chest until the final day of the State's case-in-chief.

If Tucker believed the settlement documents were so important to his defense and to attacking the State's evidence of intent, we do not understand why his trial attorney knew nothing about them until the second afternoon of a three-day trial. Even more, Tucker's brief admits fault for violating reciprocal discovery obligations but also claims the violation resulted from "the shuffling of files" across Tucker's many attorneys.

We do not attribute Tucker's failure to malice, as the dissent suggests we do. Rather, we believe neither malice nor incompetence justify a failure to comply with discovery rules. In light of these repeated failures to disclose the settlement documents, we determine Tucker did not adequately justify his discovery violation.

Likewise, the second consideration also favors the State. Tucker's discovery violation clearly prejudiced the State because it was not allowed sufficient time to scrutinize the settlement documents, prepare to cross-examine Tucker about the evidence, line up rebuttal witnesses, or formulate evidentiary arguments, such as whether the evidence was hearsay, needlessly cumulative, or confusing.

More importantly, the prejudice to the State would not have been easily cured. It would have taken significant time to investigate the settlement documents and the claims surrounding them. For example, the State might have needed to investigate why Tucker's newly purchased car already had license plates, as shown in Officer Garrett's bodycam video. It might have investigated how Tucker purchased a car without a driver's license since he stated it was lost

when he was pulled over. It also might have investigated how much the car cost because if it cost more than $3,275 (the amount he received after costs were subtracted from his settlement), his argument that the $650 was from his settlement might raise an eyebrow. Additionally, the State might have also investigated whether Tucker ever made a bank withdrawal in an amount sufficient to pay for the car.[2]

These many unknowns reveal yet another way the settlement documents would have prejudiced the State. They created significant mini-trial concerns. Questions about the documents' authenticity could easily have misled the jury and confused the issues before it. *See* Iowa R. Evid 5.403. After all, the settlement documents did not truly prove how Tucker came to possess $650 cash. The jury could believe Tucker received the QuikTrip settlement yet still conclude the $650 came from drug transactions in light of the evidence presented at trial and Tucker's own testimony.

In comparison, several factors mitigate the prejudice that exclusion brought on Tucker. The court allowed the jury to hear evidence about Tucker's QuikTrip settlement multiple times. Officer Garrett's bodycam video included statements by Tucker about his recent settlement. Officer Garrett testified

---

[2]The dissent takes issue with the fact these specific questions of fact are mentioned in the majority opinion because the State never mentioned them at trial. We see no problem with considering them, and we do not "conjure" them up here for the first time. The State mentioned some of them in oral argument, and it is free to do so because the discovery sanction issue was adequately preserved for our review. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) (citing *Jensen v. Sattler*, 696 N.W.2d 582, 585 (Iowa 2005); *Meier*, 641 N.W.2d at 540) ("If the court's ruling indicates that the court considered the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved."). Parties to an appeal frequently make novel arguments on preserved issues. Indeed, such arguments are at the heart of appellate advocacy and the purpose of oral argument.

Tucker told him about the settlement during the traffic stop, and Tucker himself testified about the settlement. The prosecutor also promised not to call attention to Tucker's failure to support his settlement testimony with documentary evidence.

If the settlement documents had "tide-shifting potential," as the dissent claims, then it is only fair to presume the State deserved sufficient time to counter them. Contrary to the claim by Tucker's lawyer, which the dissent quotes, it would take more than "five seconds" for the State to marshal rebuttal evidence and witnesses. The State would need a longer continuance, not a shorter one. And the district court, in its discretion, did not want to grant a continuance. True, other judges might have made a different call. But differences of opinion do not amount to abuses of discretion. *See State v. Belken*, 633 N.W.2d 786, 796 (Iowa 2001) (citing *State v. Gates*, 306 N.W.2d 720, 725 (Iowa 1981)) ("Generally, we defer to the trial court on discovery matters, absent an abuse of discretion, because the trial court is in the best position to determine whether prejudice resulted.").

Third, we agree with the district court that other discovery sanctions were not feasible. It is not clear whether a continuance would have helped remedy the State's prejudice. A short continuance would not have given the State time to meaningfully investigate Tucker's claims, yet a longer continuance might have required a mistrial, which would be unfair when the fault lay with Tucker. In the end, the district court chose a reasonable course. In its discretion, the court

issued a tailored evidentiary ruling that allowed the trial to proceed, excluded the settlement documents, and allowed Tucker to testify about them.

Discretion means the district court may choose one among many acceptable alternatives, so long as its choices are not clearly untenable or unreasonable. *State v. McKinley*, 860 N.W.2d 874, 878 (Iowa 2015); *see Thornberry v. State Bd. of Regents*, 186 N.W.2d 154, 161 (Iowa 1971) ("[W]e have repeatedly held, 'abuse of discretion' means no discretion to do what was done."). Here, the district court reasonably concluded it would have been highly inefficient to continue the trial. Tucker's case had been pending for some time, and the court did not want to disrupt a half-complete jury trial, especially one that the district court thought was very important and had already been continued because of Tucker's fair-cross-section challenge. These efficiency concerns are not clearly untenable or unreasonable. *See State v. Clark*, 814 N.W.2d 551, 564 (Iowa 2012) (affirming a district court's decision not to continue a trial when surprise evidence arose three days before the trial was set to start).

Fourth, we emphasize that the district court's exclusion order was tailored. The district court did not ban any or all evidence of the lawsuit settlement. Tucker may not have been allowed to introduce the settlement documents, but he was permitted to testify about the settlement itself. And the district court allowed the jury to see and hear the bodycam video in which Tucker told police the $650 came from a lawsuit settlement. We hardly think such a tailored order sent "the exclusionary guillotine blade falling."

Contrary to the dissent's suggestion, we have not lowered our guard to abuses of discretion to effectively automate affirmance of the district court. We poured over the record and scrutinized the law's application to these facts. The outcome merely recognizes that abuses of discretion are uncommon. *See Hoekstra v. Farm Bureau Mut. Ins.*, 382 N.W.2d 100, 108 (Iowa 1986) ("[A]n abuse of discretion is rarely found."); *Sullivan v. Chi. & Nw. Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982) ("We have been slow to find an abuse of discretion.").

The dissent believes the district court abused its discretion by not pursuing alternatives to exclusion. In its view, alternatives to exclusion "would seem to pose little obstacle" or "likely could have been completed quickly." But this view overlooks the daily realities district court judges face. Indeed, it fails to consider all the other proceedings on their calendars, the lawyers' schedules, court reporter availability, and the demands of trial on the jurors' time and personal lives.

We reject the notion that the district court abused its discretion because it could have paused the trial and summoned a legal secretary to the courthouse in the middle of a trial. Stopping the trial to summon a surprise witness during trial is unusual and extraordinary. It is something you might see in a courtroom television drama, but it is not something the law *requires* district court judges to do. If the district court abused discretion here, then district courts in similar circumstances will effectively be required to pause trials because other remedies, which are inefficient uses of court resources and jurors' time, might be only slightly inconvenient in the eyes of an appellate judge.

Last, the dissent's citations to federal caselaw are not persuasive. Two of the cases involve admitting evidence, not excluding it. *United States v. Jumaev*, 20 F.4th 518, 546–50 (10th Cir. 2021); *United States v. Michalik*, 5 F.4th 583, 590–91 (5th Cir. 2021). These cases affirmed district courts that admitted untimely evidence. *Jumaev*, 20 F.4th at 550; *Michalik*, 5 F.4th at 591. However, a more relevant federal case, not cited by the dissent, affirmed a trial court's ruling to exclude evidence that a criminal defendant failed to timely disclose during reciprocal discovery. *United States v. Wills*, 40 F.4th 330, 337–39 (5th Cir. 2022).

Additionally, the third federal case cited by the dissent differs from Tucker's case in an important way. In *United States v. Gray-Burriss*, the D.C. Circuit decided a district court abused its discretion in excluding exculpatory evidence as a discovery sanction. 791 F.3d 50, 56–58 (D.C. Cir. 2015). But the district court excluded the evidence for all purposes, including impeachment and refreshing recollections. *Id.* at 57–58. In this way, the district court's sanction exceeded what Federal Rule of Criminal Procedure 16 allows. *Id.* In Tucker's case, the district court order complied with the text of Iowa Rule of Criminal Procedure 2.14(6)(*c*) in all respects. And not only does rule 2.14(6)(*c*) explicitly authorize exclusion in this case, but our caselaw also permits the district court to exercise discretion in imposing a proper sanction. *See, e.g., Belken*, 633 N.W.2d at 794–97 (Iowa 2001).

**D. Iowa Rule of Evidence 5.106 and the Unedited Bodycam Video.** Next, Tucker disputes the district court's ruling to show the jury an abbreviated

version[3] of Officer Garrett's bodycam video. Tucker's brief again raises unpreserved constitutional challenges to the district court's ruling on this point. Consequently, and for the reasons cited in the preceding section, we evaluate this claim as a challenge to the district court's evidentiary rulings. *See Segura*, 889 N.W.2d at 219–20 (citing *Meier*, 641 N.W.2d at 537).

Tucker asserts the jury should have seen the entire bodycam video under Iowa Rule of Evidence 5.106. He argues the jury saw footage of him yelling and protesting while police searched his person, which made him look guilty, without seeing the portion of the recording in which one officer says Tucker was once shot by the police. Fairness, Tucker says, requires that the jury ought to have seen the whole video.

Iowa Rule of Evidence 5.106 codified the common law doctrine of completeness. *See State v. Huser*, 894 N.W.2d 472, 507 (Iowa 2017) ("The Iowa rule is broader than the federal counterpart in Federal Rule of Evidence 106, which applies only to all or part of writing or recorded statement. The Iowa rule allows admission of 'any other . . . conversation' that meets the rule's requirements.") (omission in original) (quoting Iowa R. Evid. 5.106(*a*)). Unlike most evidence rules, rule 5.106 is a rule of inclusion, not exclusion. *Compare* Iowa R. Evid. 5.106(*a*) ("[A]n adverse party may require the introduction . . . of any other . . . act, declaration, conversation, writing, or recorded statement that

---

[3]Overall, Officer Garrett's bodycam video was almost forty-three minutes long. The State removed approximately three minutes and five seconds of content from the video. The removed footage showed one officer identifying Tucker to another officer by saying Tucker is the man that a third officer (not present) shot. Also, the removed footage included inconsequential scenes of officers "standing around and waiting."

in fairness ought to be considered at the same time."), *with id.* r. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Fundamentally, rule 5.106's purpose is to prevent a party—particularly the party that presents evidence first—from misleading juries with partial or incomplete evidence. That evidence may take the form of actions, declarations, conversations, writings, or recorded statements. *Id.* r. 5.106(*a*). *But see* Fed. R. Evid. 106 (extending the rule of completeness only to writings and recorded statements, not to oral statements). Rule 5.106 achieves this purpose by accelerating the timing of a party's right to introduce evidence. *See* Iowa R. Evid. 5.106. More specifically, rule 5.106 allows a second litigant to introduce alongside supposedly partial or incomplete evidence some additional evidence "that in fairness ought to be considered at the same time." *Id.* Otherwise, the jury would be unable to hear the additional evidence until either cross-examination or the second litigant's case-in-chief, which would be unfair to the second litigant.

For example, in *State v. Austin*, we upheld a district court's decision to use rule 5.106 to admit an interview recording of a child sex abuse victim. 585 N.W.2d 241, 243–44 (Iowa 1998). The criminal defendant—the first litigant—had used a summary of the interview, provided by the state before trial, to cross-examine and impeach the victim. *Id.* Even though the defendant did not

introduce the summary or the interview recording itself, the state—the second litigant—successfully invoked rule 5.106 to demand the entire interview recording be admitted into evidence for the sake of fairness. *Id.* We also emphasized the district court wields significant discretion in deciding whether rule 5.106 applies in a particular circumstance. *See id.* at 244 ("The court was well within its discretion in allowing introduction of the videotaped interview.").

Beyond the acceleration or timing aspect of rule 5.106, it is not clear whether the rule authorizes the admission of otherwise inadmissible evidence. *See Huser*, 894 N.W.2d at 508–09 ("There is the question of whether rule 5.106 serves primarily a timing function or a trumping function."). On that question, we have simply said that "the rule cannot be simply used as an 'end run around the usual rules of admissibility.' " *Id.* at 509 (quoting *United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1161 (C.D. Cal. 2008)). To resolve Tucker's case today we do not need to settle the precise contours of rule 5.106's potential power to authorize the admission of otherwise inadmissible evidence.

As an initial matter, we seriously doubt whether rule 5.106 even applies in this instance. We see no incomplete or misleading evidence here that needs to be contextualized or completed. The statement that another officer once shot Tucker does not complete any statements or conversations in the video. In fact, the statement, in context, comes off like a non sequitur because the officer who said it was not responding to a question or statement by anyone else. Rather, he was speaking, unprompted, to another officer who had just arrived at the scene. In that context, we fail to see how the statement is one "that in fairness ought to

be considered at the same time" as the rest of the bodycam video. Iowa R. Evid. 5.106(*a*).

Yet even if the rule did apply here, Tucker could not use rule 5.106 to introduce irrelevant evidence. Neither rule 5.106 nor the common law doctrine of completeness can trump the fundamental rule that irrelevant evidence is not admissible. In other words, litigants simply may not use rule 5.106 or the doctrine of completeness to circumvent relevance. Irrelevant evidence will not further the purpose of rule 5.106 and its common law counterpart because evidence that has no tendency to make a consequential fact more or less probable cannot possibly supply additional information that will stop partial or incomplete evidence from misleading or confusing the jury.

Here, we see no reason to reverse the district court's decision to exclude the unedited bodycam video. While reasonable minds could disagree about the shooting's relevance, the district court appears to have believed the impact of previously being shot by the police would not selectively manifest itself only once law enforcement discovered drugs during a pat-down. From that perspective, the court concluded Tucker began yelling for help and resisting being searched about exactly when the officers noticed a suspicious object in his undergarments, which turned out to be marijuana, not because a police officer once shot him. Moreover, even if the district court decided the shooting was relevant, it was not an abuse of discretion for the district court to exclude evidence of the shooting because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Iowa R. Evid. 5.403.

The record ultimately reinforces our conclusions. It appears Tucker raised rule 5.106 merely to dodge the rules of evidence and the district court's motion in limine rulings, not to allegedly admit additional bodycam video that, in fairness, had to be admitted to cure would-be deficiencies in the edited footage. The edited footage was not in itself incomplete or partial such that it misled or even confused the jury. In fact, even the edited footage contained a statement by Tucker that someone named Scarlet shot him. In addition, the district court believed Tucker wanted to introduce irrelevant evidence to elicit sympathy from the jury or else show he has had prior interactions with law enforcement. We give deference to the district court's opinion about his motivations because it observed Tucker, his attitude, demeanor, and body language throughout the proceedings.

**E. Sufficiency of the Evidence.** Finally, Tucker claims there was insufficient evidence for the jury to infer he had intent to deliver a controlled substance under Iowa Code section 124.401(1)(*d*). Like the court of appeals, we disagree. A rational jury could have found Tucker intended to deliver a controlled substance. *See State v. Brown*, 569 N.W.2d 113, 115 (Iowa 1997) (citing *State v. Robinson*, 288 N.W.2d 337, 339 (Iowa 1980)) ("In a sufficiency-of-the-evidence challenge we review all the evidence to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."); *see also State v. Adams*, 554 N.W.2d 686, 692 (Iowa 1996) (explaining the importance of circumstantial evidence and inferences to prove intent).

The State offered a variety of evidence showing intent to deliver. Police officers saw Tucker exchanging something with a woman in a fast-food parking lot at about 10:30 p.m. They uncovered an amount of cash consistent with mid-level drug dealing (mostly denominated in large bills) and found hidden in Tucker's underwear a quantity of marijuana consistent with mid-level drug dealing. They also found no items for personal marijuana use. Moreover, a rational jury could have disbelieved Tucker's testimony that the $650 cash came from a lawsuit settlement. Indeed, Tucker exhausted his credibility as a witness. In front of the jury, he disobeyed multiple court orders to stand up, manufactured a specious reason for not standing, and repeatedly defied the district court's motion in limine rulings. And while Tucker's phone did not reveal evidence of drug sales and the police found no scales or packing materials, the jury could still have reasonably believed the weight of evidence favored guilt.

**IV. Conclusion.**

We affirm Tucker's conviction for the reasons set forth in this opinion.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, Mansfield, and McDonald, JJ., join this opinion. McDermott, J., files a dissenting opinion, in which Oxley, J., joins. May, J., takes no part.

**McDERMOTT, Justice (dissenting).**

Tucker argues that the district court abused its discretion when it refused to permit him to present documents about his recent personal injury settlement to the jury. Evidence of that settlement, he insists, would have offered the jury a reasonable—and critical—explanation for why he had $650 in cash with him, from a source other than the sale of drugs. What's more, the documents would not have required the jury to rely on Tucker's own claims about the existence of the settlement.

From my review of the record in this case, I agree with him. Because I believe that the district court abused its discretion in excluding Tucker's settlement documents, I respectfully dissent and would remand for a new trial in which the jury would get to see the settlement documents.

Tucker was charged with two crimes: possession of marijuana, and possession *with intent to distribute* marijuana. The State's evidence can fairly be summarized as follows: (1) Tucker, while seated in his car, exchanged something with a woman standing outside his window; (2) when Tucker noticed a police car nearby, he tried to speed away; (3) after stopping Tucker's car, police found a single ounce of marijuana in his underwear; and (4) Tucker had $650 cash in the car's center console.

Tucker's guilt on the possession charge seems indisputable; it was in his underwear. But the possession with intent to distribute charge is a different matter. The facts I just recited strike me as quite thin to prove beyond a

reasonable doubt Tucker's intent to distribute marijuana. None of these facts alone suffices to prove that charge. To find Tucker guilty of the distribution charge requires, at minimum, that the jury draw several inferential conclusions—including particularly that the $650 cash in his car came from a drug sale. Officer Garrett testified at trial that he didn't see what had been exchanged at the window and couldn't say whether Tucker might have sold drugs or purchased them. His best hunch was that Tucker was the buyer and not the seller. (Bodycam footage captured Garrett saying, "I'm pretty sure he just bought it."). The police found no evidence of packaging, weighing, or any other indicia that often accompany drug distribution. A search of Tucker's cell phone revealed no evidence of drug dealing.

Against this backdrop, we consider the district court's ruling to deny Tucker's attempt to introduce the settlement documents. Under the rules of criminal procedure, defendants may seek from the State discovery materials (documents, photos, and other tangible items) that the State intends to use at trial or that are necessary to the preparation of the defense. Iowa R. Crim. P. 2.14(2). If the court requires the State to produce these materials, then the State may request "reciprocal discovery" of the same sorts of materials from the defendant. *Id.* at 2.14(3). In this case, the district court granted the State's application for reciprocal discovery and ordered Tucker to provide any such materials before the trial.

On the second day of trial, defense counsel notified the prosecutor that he intended to introduce a law firm's settlement statement and enclosures as

evidence of Tucker's personal injury settlement. The enclosures included an image of a check written to Tucker for $3,923.68.



The settlement statement, signed by Tucker, is dated two days before the police arrested him. Tucker claimed that he'd cashed the settlement check and that the $650 was what remained of the funds after buying a car.

The State never received the documents before trial and objected to defense counsel's attempt to introduce them beyond the reciprocal discovery deadline. The prosecutor argued to the district court initially that the documents lacked foundation and that the State received "no notice of this, no opportunity to deal with this, to look into the validity of it."

In response, Tucker's trial counsel, Jesse Macro, informed the court that Tucker had provided the documents to a lawyer who had previously represented him in the case. That prior lawyer failed to forward the documents to Macro when he took over Tucker's representation. Macro explained that he'd received the settlement statement by email that morning from a secretary at the law firm that

represented Tucker in his personal injury case. Macro argued that the documents presented no unfair surprise to the State and that good cause existed to introduce them despite the reciprocal discovery violation because the State had notice of the settlement from the moment police encountered Tucker. "This information and the name of the lawyer comes up at the end of one of the officer's videos," Macro argued, with even "one of the officers . . . talking about it." Indeed, at that point in the trial a police officer had already testified that Tucker told him the $650 was from a settlement.

In response to the State's argument about an inability to authenticate the settlement statement, Macro said: "If the State wants to verify it, literally it took me about five seconds to do it at lunchtime. I'm willing to -- I'm sure the secretary is more than willing to confirm that she e-mailed it to me." Preventing Tucker from presenting the documents to the jury, Macro insisted, would imperil his client's "right to put a defense on."

The prosecutor responded that although Macro may not have had it, the defendant himself had known about the settlement statement for months, and "[i]f it's going to be an exhibit, it needed to be provided to the State in order for the State to be able to verify the authenticity of it, to verify and to be able to -- or to prepare for that." The prosecutor pressed that there was no lesser remedy "available to the Court other than exclusion."

Iowa Rule of Criminal Procedure 2.14(6)(*c*) states that if a party fails to comply with a discovery order, the court may order the delinquent party to turn over the requested materials, grant a continuance of the trial, prohibit the party

from introducing the undisclosed evidence, or "enter such other order as it deems just under the circumstances." The district court found that Tucker failed to timely provide the documents to the State under the reciprocal discovery order and, citing to rule 2.14(6)(*c*), prohibited Tucker from introducing the exhibit at trial. The district court noted that Tucker would not be prevented from testifying about the settlement *itself* (although not about the settlement documents) if he chose to testify.

The trial proceeded without the exhibit. Tucker ultimately took the stand and testified about the settlement and his claim about the source of the $650. The jury convicted him of possessing marijuana with the intent to distribute it.

Tucker argues in this appeal that the trial court erred in choosing to exclude the exhibit over other options it possessed. In evaluating the appropriate sanction for a party's violation of a duty to timely turn over discovery materials, "the trial court must consider: '(1) the circumstances surrounding the violation; (2) the prejudice, if any, resulting from the violation; (3) the feasibility of curing any prejudice; and (4) any other relevant consideration.' " *State v. Veal*, 564 N.W.2d 797, 811 (Iowa 1997) (quoting *State v. Brown*, 397 N.W.2d 689, 698 (Iowa 1986) (en banc)), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998), *vacated by Hallum v. Iowa*, 527 U.S. 1001 (1999). The majority opinion's discussion of these four considerations strikes me as incomplete, and the final tally seems to me far from the rout that the majority presents.

As to the first consideration (the circumstances surrounding the violation), although the disclosure was unquestionably late, there's no evidence that the settlement statement was intentionally withheld until trial. Late disclosure, without more, isn't enough to draw that conclusion. The court docket confirms that several lawyers represented Tucker at different points in his case. Macro's statement that one of the prior lawyers dropped the ball in forwarding the documents to Macro seems to me perfectly plausible. There is little in this record to conclude the late disclosure was some strategic scheme to gain an unfair advantage. As Hanlon's Razor suggests, we should not attribute to malice that which is adequately explained by incompetence.

And what's more, the majority trains considerable fire on Tucker personally for the failure to disclose. But there's little to suggest that fault resides with him. Tucker provided the documents to his prior lawyer, as he should have done. Rebuking Tucker because his lawyer apparently bungled the transfer of the file to another lawyer misplaces blame. Like most represented parties, Tucker could reasonably have expected that his lawyers would successfully transfer his file and handle turning over any documents, as necessary, that he had provided them. The majority's finding that Tucker has supplied inadequate justification for the late disclosure both discounts too much and assumes too much. The majority punctuates its analysis with the alarming assertion that "neither malice nor incompetence justify a failure to comply with discovery rules," evoking tones of strict liability in an area in which, up to now, we've pursued a measured consideration of the circumstances.

As to the second consideration (prejudice resulting from the violation), the State argued very little at the district court hearing about any actual prejudice that would result from the late disclosure. The majority surmises that the State might have been prejudiced because it wouldn't have had time to "scrutinize the settlement documents, prepare to cross-examine Tucker about the evidence, line up rebuttal witnesses, or formulate evidentiary arguments." Or that prejudice wouldn't have been easily cured because "the State might have needed to investigate why Tucker's newly purchased car already had license plates" or "how Tucker purchased a car without a driver's license since he stated it was lost when he was pulled over." But the State, for its part, articulated none of these concerns in its argument to the district court. It's not for us on appeal to conjure potential ways that the State might have been prejudiced when the State never presented them to the district court.

As an initial matter, it could come as no surprise that Tucker would seek to introduce evidence of his personal injury settlement to rebut the State's accusation that the $650 was drug proceeds. Tucker's assertion that the money came from a personal injury settlement was discussed *at the initial traffic stop* that gives rise to this case. The discussion of the settlement, and even the name of the lawyer that represented Tucker in that settlement, is memorialized in the police video of his arrest. In the State's case-in-chief, a police officer on direct examination testified that Tucker mentioned the settlement check when questioned about the source of the cash in his car. Perhaps conceding its own prior knowledge of the personal injury settlement, the State centered its

argument to the district court on needing to exclude the late-disclosed exhibit based on an inability to verify authenticity and lay foundation for its admission. Although these concerns are important, the type of prejudice they created didn't present much of an obstacle to overcome.

On that subject, as to the third consideration (the feasibility of curing the prejudice), remedies posing minimal disruption or delay to the trial were available. Macro made clear that he received the settlement statement that morning directly from a secretary at the law firm that issued it. For the State to contact the secretary by phone at the law firm to verify the document's authenticity probably could have been completed in under an hour. The district court could have paused the trial briefly to give the State time to authenticate it. And since both the law firm and the courthouse were in the same city (Des Moines), having the secretary come to court to lay foundation as custodian of the settlement statement similarly would seem to pose little obstacle.

The settlement statement was a standard piece of correspondence of the type commonly issued by a law firm to a client after a settlement and is a business record excepted from hearsay exclusion under Iowa Rule of Evidence 5.803(6). *See United States v. Vacca*, 431 F. Supp. 807, 811–12 (E.D. Pa. 1977) (holding that a settlement sheet prepared by a lawyer referring to the sale of property and an associated canceled check made out to the defendant as a finder's fee had been properly admitted into evidence as a business record under the federal counterpart (rule 803(6))). Testimony to establish foundation for the document likely could have been completed quickly. In short, curing the

problems that the State noted because of the late disclosure—with a short continuance and minimal hassle—appears to have been eminently feasible. *See Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 389 (Iowa 2012) (describing a continuance as "a traditional remedy used by courts when evidence is not disclosed until trial").

And as to the fourth consideration (any other relevant consideration), we have the tide-shifting potential of the settlement documents on the State's intent-to-distribute charge. The documents—and in particular, the enclosed check in the amount of $3,923.68 made out to Tucker—were the only evidence beyond Tucker's own say-so available to support his claim about the source of the cash in his car. As the court of appeals noted, this evidence contradicted the "lynchpin" of the State's case. It might well have negated in the jurors' minds the State's key contention on the intent-to-distribute charge: that the $650 came from a drug sale.

Tucker's only tangible evidence to challenge the assumption about the source of the cash was this exhibit. Tucker's own credibility had already been undermined by his testimony about the source of the ounce of marijuana in his underwear. We could reasonably expect the law firm's records to carry more probative value with the jury than a defendant's own uncorroborated, self-serving testimony. *See United States v. Gray-Burriss*, 791 F.3d 50, 56 (D.C. Cir. 2015) (finding that the defendant's defense to embezzlement charges "would have been considerably strengthened by proof of an executed agreement—signed by four union leaders—increasing his salary," which the trial

court had suppressed). Tucker was prejudiced by the exhibit's exclusion. The majority opinion suggests no disagreement with Tucker's claim that the suppressed exhibit had potentially momentous probative value; indeed, it's a point implicitly conceded by the majority's assertion that the State would have needed time to load for bear to counter it.

Our court has long recognized exclusion of a criminal defendant's evidence as a sanction of last resort. In *State v. Marchellino*, we addressed a discovery sanction against a criminal defendant under then-rule 12(3) (now rule 2.13(3)). 304 N.W.2d 252, 253 (Iowa 1981), *superseded by rule*, Iowa R. Crim. P. 12(4) (now rule 2.13(4)), *as recognized in State v. Babers*, 514 N.W.2d 79 (Iowa 1994). In that case, the defendant failed to notify the state of a witness that the defense expected to call. *Id.* The district court refused to allow the witness to testify. *Id.* We reversed the conviction and ordered a new trial, holding that excluding the witness wasn't an appropriate sanction, in part, because the rule at the time didn't specifically list exclusion as a sanction (rather, it gave the district court discretion to "proceed 'in any lawful manner' "). *Id.* at 256 (quoting Iowa R. Crim. P. 29(2) (now rule 2.35(2))).

But we went further, warning against sanctions for discovery violations that might impair a criminal defendant's presentation of evidence:

> The court should, after hearing, select an alternative which will encourage compliance with the rules, yet result in a minimum restraint on the presentation of evidence; radical surgery should not be performed on the defendant's case if conservative therapy will bring about a cure. Because discovery standards are designed to implement, not to impede, fair and speedy determinations of cases, it is suggested "that the court should seek to apply sanctions which

affect the evidence at trial and the merits of the case as little as possible . . . ."

*Id.* at 257 (quoting *Standards for Criminal Justice, Discovery and Procedure Before Trial* § 5.1, Commentary, at 108 (Am. Bar Ass'n 1970) [hereinafter ABA Discovery and Procedure Standards]) (omission in original).

The sanction of exclusion in this type of case is best employed as a tool to eliminate an improperly obtained advantage. A number of federal circuit courts addressing challenges to excluded evidence under an analogous federal rule, Federal Rule of Criminal Procedure 16, have said that excluding evidence for a discovery violation in a criminal case should be reserved for instances of bad faith or willful misconduct. For instance, in *United States v. Michalik*, 5 F.4th 583, 591 (5th Cir. 2021), the United States Court of Appeals for the Fifth Circuit said that "where a party did not act with 'an improper motive, it is rare to sanction a party in a method as draconian as suppressing the evidence.' " (quoting *United States v. Ortiz,* 213 F. App'x 312, 315 (5th Cir. 2007) (per curiam)).

In *United States v. Jumaev*, 20 F.4th 518, 547 (10th Cir. 2021), the Tenth Circuit observed: "[W]e have instructed that '[t]he court should impose the least severe sanction that will accomplish prompt and full compliance with' the violated discovery requirement. 'The preferred sanction is a continuance.' 'It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings.' " (second alteration in original) (citations omitted) (first quoting *United States v. Gonzales,* 164 F.3d 1285, 1292

(10th Cir. 1999); then quoting *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002)).

And in *United States v. Gray-Burriss*, the D.C. Circuit held that exclusion of the defendant's evidence "was too severe a sanction" even when disclosed well past its due date, during the second week of trial. 791 F.3d at 56. The court reached this conclusion because the evidence "was potentially a significant piece of exculpatory evidence," the government didn't identify how it was prejudiced by the defendant's use of the exhibit, and the evidence was not withheld in bad faith. *Id.* The majority attempts to distinguish *Gray-Burriss* because the trial court in that case excluded the evidence for all purposes, while in this case Tucker was only prevented from introducing the documents themselves. But this misses the point.

> Most relevant here, "although Rule 16 gives trial judges the option of suppressing evidence as a result of [a party's] discovery violations[,] such a severe sanction would seldom be appropriate where . . . the trial court finds that [the party's] violation did not result from its bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice."

*Id.* at 55–56 (first and third alterations and omission in original) (quoting *United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998)). An absence of bad faith "takes on greater significance," according to the court, "when, as here, the evidence is exculpatory on its face and there is no showing of prejudice." *Id.* at 56–57.

The majority stresses the deferential standard of review that applies to the district court's decision in this case. And indeed, on the continuum of standards that a party must overcome to establish that a judge made an error, the "abuse

of discretion" standard undeniably falls on the hard-to-show end. But we nonetheless maintain an obligation to carefully examine the district court's reasoning even when the court is granted a large dose of leeway in making a decision. An appellate court can't lower its guard and allow an abuse-of-discretion standard to effectively automate an affirmance. Anything less risks setting the line for a challenger to rise above in abuse-of-discretion challenges by painting the line on the ceiling.

We generally confront the types of mistakes that we'll tolerate in criminal litigation aiming to minimize the prospect of a wrongful conviction. This choice reflects, in some measure at least, the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Schlup v. Delo*, 513 U.S. 298, 325 (1995) (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).[4] The process is designed, in many significant respects, to err on the side of protecting innocence.[5]

To be sure, the rules of criminal procedure "are not suggestions," as the majority declares. But that statement obscures the sensitive task required in

---

[4]Or as Blackstone famously expressed this principle (with a much higher ratio): "[B]etter that ten guilty persons escape than that one innocent suffer." 4 William Blackstone, *Commentaries* *358.

[5]For instance, in all state and federal courts, felony criminal convictions require a unanimous jury verdict. *See Ramos v. Louisana*, 140 S. Ct. 1390, 1402 (2020). In all criminal appeals, the basic principle prevails that defendants may appeal convictions, but the government may not appeal acquittals. *See Fong Foo v. United States*, 369 U.S. 141, 142–43 (1962) (per curiam); *State v. Kessler*, 213 N.W.2d 671, 672 (Iowa 1973) (per curiam). Unlike civil cases, in which lawyers pursue results advantageous to their own client, in criminal cases the primary duty of the government's lawyer is not to convict, but "to seek justice within the bounds of the law." *Criminal Justice Standards for the Prosecution Function*, Standard 3–1.2 (Am. Bar Ass'n 4th ed. 2017). Prosecutors are even obligated to coordinate with their own agents and other agencies to follow up on evidentiary leads even when they believe that the resulting information will harm their case. *Id.* Standard 3–5.4. Other examples abound.

this particular case. The late disclosure of a document doesn't automatically send the exclusionary guillotine blade falling. Proper application of the four considerations that we require district courts to assess in deciding the sanction in these circumstances is vital. And as we made clear over forty years ago in *Marchellino*, the court's choice of sanction in a criminal case should, whenever possible, seek to "affect the evidence at trial and the merits of the case as little as possible." 304 N.W.2d at 257 (quoting ABA Discovery and Procedure Standards § 5.1, Commentary, at 108).

The district court, in my view, failed in that task in this case, unreasonably exercising its discretion to sanction Tucker with exclusion when less drastic cures were available that would have permitted the jury to see and consider this important exculpatory evidence. Because Tucker was prejudiced by the trial court's decision to exclude this evidence, he should be granted a new trial.

Oxley, J., joins this dissent.